## Case No. 3,613.

### Ex parte DAVIS.

[14 Law Rep. 301; 9 West. Law J. 14.]

District Court, N. D. New York. Aug, 17–29, 1851.

FUGITIVE SLAVE LAW — COMMISSIONER'S CERTIFICATE—RETROACTIVE OPERATION — HABEAS CORPUS.

1. The provisions of the 6th section of the fugitive slave act [9 Stat. 463], that "the certificate of the commissioner shall be conclusive, &c., and shall prevent all molestation, &c., by any process issued by any court, judge, magistrate, or other person whatsoever," applies only to a certificate which appears on its face to be granted, or by a reasonable interpretation of its language might have been granted, in conformity with the act, and in pursuance of the authority thereby. conferred, by a person having power to grant it, and proceeding in a manner warranted by the act.

2. The provisions of the 10th section of the fugitive slave act, "that when any person held to labor," &c., "shall escape," are clearly prospective, and inapplicable to the case of an escape occurring before the passage of the act.

3. Where it appears from the face of the certificate that the adjudication was made without evidence, the error can be corrected on habeas corpus.

4. By the common law of England and this country, the writ of habeas corpus is not granted of mere course, nor without probable cause shown.

On the 17th August an application was made to Judge CONKLING, in behalf of the petitioner [John Davis], for a writ of habeas corpus ad subjiciendum, to be directed to Mr. George B. Gates, one of the deputy marshals of this district, in whose custody the petitioner was alleged to be, at the city of Buffalo. The petition alleged that the petitioner was restrained of his liberty in the custody of the above-mentioned officer, under pretence that he was a fugitive from labor, and in virtue of a warrant, a copy of which was annexed to the petition; wherefore he prayed a writ of habeas corpus to discharge him from custody, on the ground that, as he was advised by his counsel, and believed, his imprisonment was illegal, that he was a free man, and that the commissioner, by whom the warrant was issued, had no jurisdiction to issue the same. Annexed to the petition, was a copy of a warrant issued by H. K. Smith, Esq., a commissioner of the circuit court of the United States, purporting to have been granted on the application of Benjamin S. Rust, the duly authorized agent and attorney of George J. Moore, of Louisville, in the state of Kentucky, alleging that the petitioner owed labor and service. to the said Moore, and that he was a fugitive therefrom. By an indorsement on the warrant, it appeared that the same had been executed and returned and that the deputy marshal had the petitioner in custody, in virtue thereof. The petition contained no allegation of irregularity in the proceedings before the commissioner, nor was it alleged in the petition, or ·by the counsel for the petitioner, that there was any insufficiency in the warrant, apparent upon its face. This application was denied by the judge, on the ground of want of probable cause; it being, as he stated, a settled rule both in England, and, in the absence of any statute injunction to the contrary, in this country also, that the writ of habeas corpus was not grantable of mere course, nor without probable cause shown. It was an extraordinary remedy for unlawful restraint of personal liberty, and no court or judge had authority to allow it, except in cases apparently of this nature. It was not enough for the petitioner to allege, in general terms, that his confinement was illegal; he was required to show that it probably. was so in fact. In the case before him, conceding the validity of the statute under which the commissioner had acted, not only had the petitioner failed to fulfill this requirement, but, on the contrary, it expressly appeared that the commissioner, in causing his arrest and detention, had only discharged an imperative duty enjoined upon him by law; and with regard to the act, the judge said he did not consider himself at liberty to treat its constitutionality as any longer an open question. Nearly a year had elapsed since it received the sanction of the two houses of congress, and, in accordance with the official opinion of the attorney general of the United States, the approval of the president. No act of the national government had ever more strongly arrested the attention of the American people, or been more closely scrutinized. It had been repeatedly brought under discussion and consideration before the judges and judicial tribunals of the country, both state and national, and in every instance its constitutionality had been unequivocally asserted and maintained. Among those by whom this opinion had either directly or indirectly been declared, are, at least, three of the judges of the supreme court of the United States, all of whom, moreover, are citizens of states in which slavery does not exist. Under these circumstances, Judge CONKLING said, it was, in his judgment, wholly unnecessary, and would be scarcely decorous, for him to enter upon the examination of the question at all. At an earlier period it would have been his duty to do so, and to be governed by his own independent conclusions; and this duty, he should not, for a moment, have hesitated to perform.

The motion for a habeas corpus, having for these reasons been denied, a second petition was presented on the 19th, on which the motion was renewed. The petitioner states that he is still restrained of his liberty, in the custody of Mr. Gates, the deputy marshal; that after his arrest, in virtue of the warrant mentioned in his first petition, having been brought before the said commissioner, he, the said commissioner, made out a certificate, di-

recting the petitioner to be taken to the state of Kentucky, whence, as it was alleged, he had escaped, and where he still owed service. The petitioner further alleges that as he is advised by counsel, and verily believes, the proceedings before the commissioner are null and void, for want of jurisdiction in the said commissioner to make the said certificate, because there was no evidence before him that he, the petitioner, was a slave, but that, on the contrary, the proof, as the petitioner was further advised, established his freedom; that the said proceedings were founded upon an alleged record of the county court of Jefferson county, in the state of Kentucky, which record is not exemplified under the seal of the said court, in pursuance of the act of congress in such case made and provided, wherefore, as the petitioner is further advised, the said pretended record is void, and the commissioner acquired no jurisdiction under the same; that there was no other proof before the commissioner, aside from such pretended record, that the petitioner owed service to the claimant, Moore, but, on the contrary, there was proof that the claimant brought and permitted the petitioner to come to Cincinnati, in the state of Ohio, whereby, as he is further advised, and believes, he acquired his freedom. And the petitioner further states that, to the best of his knowledge and belief, there was not before the commissioner any evidence, except the same pretended record of the fact of his escape from Kentucky; and lastly, that, to the best of his knowledge and belief, he is not detained for any other cause. The petition, for reasons stated in the affidavit, is verified by the oath of Mr. Love, acting as the counsel of the petitioner. On this petition, Judge CONKLING granted an order nisi, returnable on the 26th day of August. On that, and the following day, the case was ably argued by Mr. Talcott for the petitioner, and Mr. Foster for the claimant.

In opposition to the rule, the counsel for the claimant read an affidavit made by Mr. Gates, the deputy marshal, setting forth the proceedings before the commissioner, and incorporating the certificate granted by him. Appended to the certificate, as forming a part thereof, was the petition of the claimant's agent and attorney, and the power of attorney under which he acted; the warrant of arrest; the transcript of a record of the county court of Jefferson county, in the state of Kentucky, authenticated by the attestation of the clerk, and an impression of the seal of the court thereon, stating it had been proved to the satisfaction of that court, by the affidavits of two persons therein named, that the petitioner owed service to the claimant, and that he had, on or about the 25th day of August, 1850, escaped therefrom into the state of Ohio, which record was referred to, in the certificate, as the evidence by which the facts therein stated were established before the commissioner; and the affidavit of the agent, of his apprehension of a rescue. At the close of the argument, on Wednesday, the 27th of August, Judge CONKLING said he did not believe he should be able to decide the case before the morning of the second day thereafter, but that he should endeavor to do it at that time, which he accordingly did, by delivering the following judgment:

CONKLING, District Judge. An order nisi having been granted by me several days ago, for a writ of habeas corpus ad subjiciendum, to bring before me the body of John Davis, for the purpose of inquiring into the legality of his confinement, in the custody of one of the deputy marshals of this district, and the case having been fully argued by counsel, and considered by me, I am now to declare my opinion of the law thereupon.

The case is one in its nature, calculated, as we know, by recent experience, to arouse the passions and prejudices of men in this part of the Union; and this tendency, in the present instance, has been unhappily inflamed by an extraordinary incident reported to have attended the original arrest of the petitioner. But the circumstances to which I have alluded, however deplorable, it is scarcely necessary to observe, can have no legitimate influence whatever upon the decision of the question before me, and are to be remembered, if at all, only for the purpose of inspiring a deeper sense of judicial duty, and greater caution in its discharge. If the prisoner is entitled by law to the privilege of the writ of habeas corpus, it must be awarded; if not, it must be withheld; and in neither event can the result afford any just ground for dissatisfaction, still less any apology for the indulgence of a spirit of insubordination to the laws of the land. It is proper, at the outset, to observe that, as I hoped and expected, when the order nisi was made, the merits of the case are now as fully before me as they could be on the return of a writ of habeas corpus, should one be granted. The real question to be decided, therefore, is, whether the petitioner is entitled to his discharge; for it is an obvious as well as an established rule that when, upon an application for a habeas corpus, it appears that it would be fruitless to the petitioner if allowed, it is not to be granted.

Before proceeding to an examination of the merits of this application, it may not be amiss to advert to the source of the power which I am called upon to exercise. The government of the United States is one of expressly delegated powers, and its functionaries can exercise no authority except such as, either in terms or by reasonable intendment, has been conferred by the constitution, or by laws passed in accordance therewith. To guard against possible restrictions of the great privilege of habeas corpus, it was deemed expedient, by an express provi-

sion of the constitution, to forbid its suspension, unless when, in case of rebellion or invasion, the public safety might require it. With this exception, it was left, as one of the elements or incidents of the judicial power, to be regulated by law; and in order to give it vitality, it was necessary for congress to confer the power to grant it, and to designate the functionaries by whom this power should be exercised. This was done by the 14th section of the judiciary act of 1789, which, as it has been authoritatively interpreted, invests all the courts of the United States, and the several judges thereof, with the power to issue this writ, "for the purpose of inquiring into the cause of commitment." The act does not prescribe the cases in which this form of remedy may be resorted to, nor does it define the power of the court or judge in cases where it lies. Recourse for these purposes must therefore be had to the common law, and especially to the celebrated habeas corpus act of 31 Car. II., designed to correct and effectually guard against the scandalous evasions and abuses by which the practical efficacy of the writ of habeas corpus had become in a great degree destroyed during the arbitrary reign of the Stuarts. 3 Bl. Comm. 130–138; Ex parte Bollman, 4 Cranch [8 U. S.] 75; 2 Cond. Eng. Ch. 33; Ex parte Watkins, 3 Pet. [28 U. S.] 193, 201, 202. His honor examined at length the authorities cited at the argument, and especially the cases Ex parte Kearney, 7 Wheat. [20 U. S.] 38, and Ex parte Watkins, 3 Pet. [28 U. S.] 193, —"the latter being mainly relied on by the counsel for the claimant,"—and which establish the principle that when, by a court of competent jurisdiction, a judgment, in its nature final, has once been pronounced, it cannot be reviewed on habeas corpus; and he then proceeded as follows:

It is upon this principle that the claimant relies, and the question is, whether or not it furnishes the rule of decision for the present case. For the purpose of determining this question, it is proper to examine into the nature of the adjudication which it is proposed to bring under review. The adjudication was made by one of the commissioners of the United States, for this judicial district. The office of commissioner was created by an act of congress, passed in 1812 [2 Stat. 679], by which the several circuit courts were authorized to appoint suitable presons to take acknowledgments of bail and affidavits, in civil causes depending in such courts; and by an act passed a few years later, the persons so appointed were authorized to perform the like services in causes in the district courts. By this latter act, and other acts, subsequently passed, other powers were successively conferred upon these officers; and lastly, by the first section of the act of September 18, 1850, known as the "Fugitive Slave Act," they are "authorized and required to exercise and discharge all the powers and duties conferred by this act." The fourth section further declares that the commissioners "shall have concurrent jurisdiction with the judges of the circuit and district courts of the United States, in their respective circuits and districts." By the sixth section it is also enacted that the certificates to be granted under the act "shall be conclusive of the right of the person in whose favor granted, to remove such fugitive to the state or territory from which he escaped, and shall prevent all molestation of such person or persons, by any process issued by any court, judge, magistrate, or other person whatsoever." Now whatever ground for doubt, if any, might have existed, independently of this enactment, concerning the legal force and effect of these certificates, it may, I think, be safely assumed that it was intended by congress to place them, in this respect, substantially on the footing of judgments rendered by judicial tribunals, in cases within their jurisdiction. But, notwithstanding the wide scope of the doctrine laid down by the supreme court in the Watkins Case, I am also of opinion, and indeed this was distinctly admitted by the learned and able counsel who appeared for the claimant, that this conclusive effect can be ascribed to a certificate only when it appears on its face that it was granted, or, at least, according to some reasonable interpretation of its language, might have been granted, in conformity with the act, and in pursuance of the authority thereby conferred. Unquestionably it should appear to have been granted by a person having power to grant it, and proceeding in a manner warranted by the act. It is only to such certificates that the principle of law relied on by the counsel for the claimant can be applied, and such only can congress be presumed to have had in view. I regret that the circumstances of the case, and my own indispensable engagements, requiring my immediate departure to a remote part of the district, preclude me from fortifying and elucidating this proposition, and reconciling it with the case Ex parte Watkins, by a reference to authorities. But I shall assume it as unquestionable. The counsel for the petitioner denies that the certificate now in question is of this character. One of the objections to its sufficiency is that the person by whom it was granted is therein described as "a commissioner appointed by the second circuit court," and as "a commissioner appointed by the circuit court for the second circuit," when in truth there is no such court, and, of course, no such commissioner. The objection is true in point of fact, and if there was not another, of a more serious nature, this would, at least, require consideration. But it is further objected that the case of the petitioner is not embraced by the act, or rather by that part of it under which the proceeding was entertained, and by which alone

it could have been authorized. It is due to the highly respectable gentleman, by whom the certificate was granted, to observe that this objection appears not to have been made before him, and probably it was not thought of by him, or, until afterwards, by the counsel for the petitioner. The claimant saw fit to avail himself of the provisions of the 10th section of the act, by which the owner of a fugitive slave is permitted to make proof of the main facts of title and escape before a court of record, or some judge thereof, in the state whence the escape was made; and having obtained a transcript of the record, which such court is required to make, of the matters so proved, to exhibit the same to the judge or commissioner, to whom application shall be made, in the state where the fugitive shall be found, as conclusive evidence of the facts therein stated. Such a record was produced before the commissioner, in the present case, and is distinctly stated, in the certificate, to have formed the basis of his action in the premises.

It was suggested at the argument, though apparently with no great confidence, that the commissioner might, by possibility, have had other competent evidence before him; but I am clearly of opinion that no such supposition is admissible. There is not, in the papers before me, the slightest intimation to this effect, but, on the contrary, the transcript is exclusively referred to throughout as the evidence by which the title of the claimant and the fact of escape were established. But the escape is also throughout alleged to have occurred "on or about the 25th day of August, 1850," whereas, the act was not passed until the 18th of September following; and it is upon these dates that the objection is founded. The language of the 10th section of the act is this: "And be it further enacted, that when any person held to labor or service, in any state or territory, or in the District of Columbia, shall escape therefrom, the party to whom such service or labor is due, his, her, or their agent or attorney, may apply to any court of record therein, or judge thereof in vacation, and make satisfactory proof," &c. Now it is insisted that this provision is clearly prospective, and therefore inapplicable to the case of an escape from labor or service, occurring before the passage of the act; and such, I am constrained to say, appears to me to be the plain sense of the enactment. It was argued by the counsel for the claimant that, this being a remedial act, it is to be so construed as to suppress the mischief, and advance the remedy; and that, if it can be reasonably inferred from its whole tenor that the provision in question was designed to act retrospectively, it is to be so interpreted. But when the language of a statute is unambiguous, and leads to no absurdity or palpable injustice, it is to be in-

terpreted according to its natural import. It may be conceded that the legislative intent imported by the words used might have been more explicitly declared, by the addition, immediately after the word "shall," of the word "hereafter," or of the words "after the passage of this act;" but it cannot, I think, be maintained that this intent is not unequivocally expressed by the word "shall" alone. If I were permitted, however, to look beyond the terms of the provision itself, and to speculate upon its probable design, I am unable to perceive that the result would be varied. The only other part of the act specifically referred to by the counsel for the claimant, for the purpose of shedding light upon that under consideration, is the beginning of the sixth section, which provides for a different mode of establishing the facts of title and escape. The words here are: "That if a person held to service or labor in any state or territory of the United States, has heretofore, or shall hereafter escape," &c. The argument is that it is manifest from this language that congress intended to provide for cases of prior as well as subsequent escape. There can be no doubt of this, so far as the provisions of this section are concerned. But it is to be considered that the 10th section introduced a most important innovation upon the law as it was before the passage of the act. It authorizes an ex parte application to a court or judge, to be selected by the claimant, in the absence of, and without notice to, the party to be affected by the proceedings, to determine questions of fact, involving his freedom or servitude for life, and declares the decisions of such court or judge to be full and conclusive evidence of the facts decided, and therefore binding upon the judgment and conscience of the court, judge, or commissioner in any other state, before whom the alleged fugitive may be reclaimed. It is not my province to express any opinion upon the reasonableness of this great innovation. It must be conceded that there were not wanting strong and justifiable motives for its enactment, and it is sufficient, for those whose duty is is to execute it, that congress have seen fit to adopt it. But it may, I think, well be supposed, that in deference to the spirit of the great principle of natural justice and constitutional law, which forbids the enactment of ex post facto laws, it was intentionally limited to cases of escape from servitude, thereafter to occur; and this inference, I am of opinion, is rather strengthened than weakened by the retroactive phraseology employed in the 6th section. The liability of this provision to abuse is too obvious to escape notice, and it is worthy of observation that in the present case, as it appears by the record of the Kentucky court, instead of requiring the personal attendance of the witnesses of the claimant, the court

saw fit, in the discharge of the grave and responsible duty imposed upon it by the act, to receive affidavits, and to act upon them alone, although the deponents are described as residents of the city of Louisville, where the court was held. It may well be that these witnesses were credible persons, able, from their own knowledge, to attest to all the facts requisite fully to warrant the decisions of the court, and that a careful cross-examination would have elicited no other facts favorable to the petitioner; but conceding that the evidence before the court might lawfully be held by it to constitute the "satisfactory proof" required by the act, the opposite course of procedure would, to say the least, have been more consonant with the established, and, as I had supposed, universally recognized principles of enlightened jurisprudence. I am, therefore, also of opinion that it is my duty to apply to this enactment the same rule of construction that is applicable to penal statutes. "It was," says Professor Christian, "one of the laws of the twelve tables of Rome, that whenever there was a question between liberty and slavery, the presumption should be on the side of liberty. This excellent principle our law has adopted, in the construction of penal statutes; for whenever any ambiguity arises in a statute, introducing a new penalty or punishment, the decision shall be on the side of lenity and mercy; or in favor of natural right and liberty; or, in other words, the decision shall be according to the strict letter in favor of the subject. And though the judges, in such cases, may frequently raise and solve difficulties contrary to the intention of the legislature, yet no further inconvenience can result, than that the law remains as it was before the statute. And it is more consonant to principles of liberty that the judge should acquit whom the legislator intended to punish, than that he should punish whom the legislator intended to discharge with impunity." 1 Bl. Comm. 88, note 19.

The result of this examination then is that, though the evidence on which alone the commissioner founded his adjudication would have been sufficient and conclusive in a case arising after the passage of the act, it was wholly inapplicable to a case like the present, arising before the passage of the act. In other words, as appears on the face of the certificate itself, the adjudication was made without evidence, and the only question is whether this great error, arising, I have no doubt, from inadvertence, can be corrected on habeas corpus. I think it may, and that it is my duty to do it. If, as has been said, "A good warrant is a good cause of detention," the converse of the proposition is not less true. I shall accordingly allow the writ, but it must be made returnable before me at the court-house, in Buffalo, at two o'clock p. m., to-morrow.